# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1063 | **DATE** | 6/18/2002 |
| **CASE TITLE** | Board of Education of Evanston, etal vs. John M., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. For the reasons set forth above the Parents' motion for summary judgment is granted in part and denied in part. The Parents are entitled to the following damages: one year in compensatory occupation therapy, $800 to cover their fees for the IEE, use of an Inclusion Facilitator if he or she is at no cost to the School District and reasonable attorney fees and costs. The School District's motion for summary judgment is granted as to the alleged violations of the IEP in which we upheld the Hearing Officer's decision and the Parents' request for compensatory education as to physical therapy, speech therapy, and reading and math is denied. This case is hereby terminated. This is a final and appealable order. (Related 01 C 1052)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JUN 1 9 2002
date docketed

docketing deputy initials

date mailed notice

TP

courtroom deputy's initials

**Document Number**

9

U.S. DISTRICT COURT
CLERK

02 JUN 18 PM 2: 03

OI 0

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN M., by his Parents and Next Friends, )
CHRISTINE M. and MICHAEL M., )
                                                      )
        Plaintiffs, )
                                                      )
             v. )
                                                      )

**DOCKETED**
JUN 1 9 2002

BOARD OF EDUCATION OF EVANSTON )
COMMUNITY CONSOLIDATED SCHOOL )
DISTRICT 65, and DR. HARDY R. MURPHY )
its Superintendent, sued in his Official Capacity, )
                                                      )
        Defendants, )

No. 01 C 1052
    01 C 1063

------------------------------------------------------- )

BOARD OF EDUCATION OF EVANSTON )
COMMUNITY CONSOLIDATED SCHOOL )
DISTRICT 65, and DR. HARDY R, MURPHY )
its Superintendent, sued in his Official Capacity )

Judge Ronald A. Guzman

                                                      )
        Plaintiffs. )
                                                      )
             v. )
                                                        )

JOHN M., by his Parents and Next Friends, )
CHRISTINE M. and MICHAEL M. )
                                                      )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

These actions arise from cross appeals by Christine and Michael M., parents of John M.

("Parents"), and by the Board of Education of Evanston Community Consolidated School

District ("the School District") from the October 17, 2000 due process hearing. The School

District initiated the due process hearing to resolve issues relating to John M.'s education. The

Parents raised additional issues to be decided at the due process hearing thereafter. The Hearing

Officer issued her decision on October 17, 2000 and both parties have appealed the Hearing

Officer's decision. The parties have crossed moved for summary judgment pursuant to Fed. R.

Civ .P. 56. For the reasons set forth below, the Parents' motion for summary judgment is granted

in part and denied in part, and the School District's motion for summary judgment is granted in

part and denied in part.

## FACTUAL BACKGROUND

At the time of the due process hearing, John M., who has Down Syndrome, was almost

ten years old and had just entered the fourth grade at a school within the District. John has

received special education services since entering kindergarten in 1996. The School District

prepared an Individualized Education Program for John for the 1999-2000 school year during

which John attended third grade. This case primarily involves the adequacy of the 2000-2001 IEP

developed for John.

John's third grade IEP provided for placement in a regular education classroom with 400

minutes of special education resources and related services to be provided on a "pull-out" and in-

class basis. These services included 150 minutes per week of speech and language resources, 30

minutes per week of direct OT services and 60 minutes per month of PT consultation. John was

also assigned a full-time teacher's aide.

OT services were provided by Cathy Duba, and consisted of 30 minutes per week of

direct services. Ms Duba received her M.A. in OT in August, 1999. She took the next scheduled exam and passed it in March, 2000 and received her license in May, 2000. In the interim she was authorized to practice under an authorization to work. Her supervisor was Denise Johnson, a licensed OT. Duba also consulted with another District OT, Susan Weinstein, regarding her work with John. Denise Johnson did not observe any of Ms. Duba's sessions with John, nor did any licensed therapist provide services at any of Ms. Duba's assigned schools while she was there. Neither Ms. Johnson nor Ms. Weinstein testified at the due process hearing.

At the beginning of the school year, Duba reviewed John's IEP and met with the special education resources and classroom teachers to assess John's abilities and needs. Duba worked with John both in the classroom and in pull-out sessions on the physical mechanics of writing skills (e.g. grasp, finger movement, letter formation) as well as self-help skills such as zipping his coat. Duba consulted periodically with the classroom and resource teachers as well as John's aide.

PT consultation services were provided by Patricia Anderson. This involved observation of John in the classroom, especially in PE, on the playground and in the lunchroom to assess his functioning and needs, along with consultation with John's classroom and resource teachers and teacher's aide to develop strategies and accommodations and appropriate modifications of the curriculum. As a result of these observations and discussions, Anderson recommended use of an adaptive seat cushion to assist John's posture in the classroom and specific accommodations to enable John to participate in the PE activities.

During the school year, the Parents participated in twice weekly 20-minute planning sessions with John's classroom teacher, Michael Dugo, and his Case Manager and Special

Education Resource teacher, Nellie Ayala-Feeney. In addition, the classroom teacher extensively used a communication book to apprize the Parents of John's activities and to answer the Parents' questions. Six multi-disciplinary conferences were held with the Parents and various members of John's CARE team during the 1999-2000 school year to assess John's progress and to modify his IEP to meet his needs. Two of the meetings in September occurred because the Illinois State Board of Education had found District 65 to be in non-compliance with federal regulations and had ordered District 65 to complete a functional analysis of John's behavior and to convene that IEP meeting to consider that evaluation and to draft a behavior management plan if necessary; that two of those meetings occurred because of the occupational therapy that was being provided by Ms. Duba, and the final meeting was the parent-teacher conference. John's resource and classroom teachers and teacher's aide also met a third time during the week.

As a result of these meetings and discussions with the Parents, the School District made several modifications to the IEP during the 1999-2000 school year to better meet John's needs, including:

- Implementation of a behavior intervention plan;

- Consultation with Project Choices, a private organization, which provides consultation on inclusion strategies for special education students, to devise strategies to better integrate John in regular classroom activities and to apply specific education techniques in the classroom; and

- Implementation of a "buddy system" with classmate volunteers to play and eat with John.

John made some academic progress during that 1999-2000 school year. John's classroom teacher, for example, reported that John's reading and writing showed good improvement. OT therapist Duba reported that John's fine motor skills allowed him to participate in the classroom

and that he was able to write, use a keyboard, etc. Likewise, PT therapist Anderson reported that John was able to participate in PE classes, was making steady progress and had achieved his IEP Goals.

In the Spring of 2000, the School District conducted its tri-annual evaluation of John. The Parents and School District initially disagreed as to how to perform the evaluations because the Parents did not want standardized testing in the psychological evaluation because that testing had already been performed would reveal nothing useful about John for educational purposes and the Parents wanted John's evaluation to focus on how John was doing in the classroom, and to having a more coordinated program.

The evaluation performed by Ms. Duba was done by observation using an observation checklist prepared by the American Occupational Therapy Association. The extent to which Ms. Duba consulted with John's other teachers is disputed. PT therapist Ms. Anderson likewise evaluated John through classroom observations and consultations with his teachers and aide and consulted with John's private PT therapist. The checklist was altered to not include standardized testing.

With John's tri-annual evaluations in hand, the District then prepared John's recommended IEP for the 2000-2001 school year. The IEP provided for 30 minutes of OT consultation per month, 30 minutes per month of direct physical therapy, and 30-60 minutes per month for physical therapy consultation. It is undisputed that the School District's Special Services Director, Dan Thompson, added the 30 minutes per month of direct PT services to the IEP based upon the Parents requests to do so. However, it remains disputed whether this IEP addressed John's needs and developed appropriate goals and short-term objectives which

included adequate evaluation criteria to assess John's progress toward meeting these goals.

Before and after the IEP meetings, the Parents requested a private OT and PT evaluation of John because they disagreed with the proposed level of OT and PT services included in John's IEP. The School District rejected this request for a private evaluation, but offered to perform additional OT and PT evaluations by the School District staff, using standardized testing if the Parents would consent. The Parents rejected this offer and engaged therapists from Pathways, a private organization, to perform an evaluation in July, 2000.

The Pathways evaluators used standardized tests in a non-standardized fashion in evaluating John. Although they did not observe John in the classroom they developed a clinical picture of John based on examiner judgment and used information from John's teachers, therapists and parents, and other methods of gathering information. Pathways agreed with the School District that 30 minutes per week of direct PT services was appropriate but rejected a consultative program for John except in one discreet area.

The due process hearing was initially requested by the School District, as required under 34 C.F.R. §300.502(b)(2), after Defendant denied the Parents' request for an independent occupational therapy and physical therapy evaluation of John in connection with the development of John's IEP for fourth grade. Subsequently, the Hearing Officer agreed to include in the hearing a number of issues raised by the Parents relating to the alleged deficiencies in John's IEP and procedural violations of the IDEA by the School District. The Hearing Officer identified 11 issues to be decided in the due process hearing.

The due process hearing took place over four days and included testimony from sixteen witnesses as well as extensive exhibits. The Hearing Officer held in favor of the School District

with respect to its denial of reimbursement for an independent OT and PT evaluation and on all

of the Parents' claims of IEP deficiencies and IDEA procedural violations except for issues 4 and

7. With respect to issue 7 the Hearing Officer ordered that the District provide John with 60

minutes per week of direct OT services during the 2000-2001 school year as compensatory

services because she found that the Defendants' OT therapist was not appropriately supervised

within the meaning of Illinois regulatory provisions governing licensed OT therapists, and was

not a "qualified personnel" within the meaning of IDEA. Further, she found that District 65's

social-emotional goals for John, were inappropriate, and ordered District 65 to amend the IEP

accordingly.

The Parents appeal from the Hearing Officer's decision insofar as she ruled against them

and denied their claims of IEP deficiencies and IDEA procedural violations. The School District

appeals from the decision only insofar as the Hearing Officer ruled, in effect, that the District

violated the IDEA by providing John OT related services by an improperly supervised therapist

for most of the 1999-2000 school year and awarded compensatory services therefor.


## DISCUSSION

### A. Statutory Framework of the IDEA

The IDEA creates a federal grant program to assist state and local agencies in educating

disabled children. *See* 20 U.S.C. § 1412. To receive funds under the IDEA, states must provide

disabled children with the opportunity to receive a "free appropriate public education" ("FAPE")

by offering each student special education and related services under an individualized education

program ("IEP"). *See* 20 U.S.C. § 1412(a)(1), (a)(4). The standards to determine whether a child

under the IDEA has received a FAPE were set forth in *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). *Rowley* established two questions for determining whether a school district has provided a FAPE to a child: 1) whether the IEP is reasonably calculated to enable the child to receive an educational benefit, and 2) whether the district has complied with procedures set forth in the IDEA for drafting the child's IEP.

To ensure children with disabilities and their parents are guaranteed procedural safeguards with respect to each IEP, the IDEA requires states to establish, and abide by, certain measures. *See* 20 U.S.C. § 1415(a). Among these measures is a requirement that if the parents of a disabled child disagree with their local educational agency regarding the appropriateness of the child's current IEP, and informal review procedures have failed, the parents have the right to resolve the matter in an impartial due process hearing to be conducted by the agency. *See* 20 U.S.C. §1415(f); *see also* 34 C.F.R. § 300.507. Following this hearing, the parents retain the right to challenge the decision of the educational agency through a civil action brought in either state or federal court. *See* 20 U.S.C. § 1415(i)(2). Procedural flaws that result in loss of educational opportunity or that seriously infringe upon the parents' opportunity to participate in the IEP formulation clearly result in denial of a FAPE, *W.G. v. Target Range Sch. Dist.*, 960 F. 2d 1479, 1484 (9th Cir. 1992) and *Heather S. v. State of Wisconsin*, 125 F. 3d 1045, 1059 (7th Cir. 1997).

## B. Standard of Review

Although styled as motions for summary judgment, these cross motions are "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative

record." *Heather S. v. Wisconsin,* 125 F. 3d 1045, 1052 (7th Cir. 1997), *citing Hunger v. Leininger,* 15 F. 3d 664, 669 (7th Cir. 1994), *cert. denied,* 513 U.S. 839, 115 S. Ct. 123, 130 L. Ed. 2d 67 (1994). Our review here is more stringent than merely ensuring that the hearing officer's decision is supported by substantial evidence, but it is not completely *de novo* either. We are to give "due weight" to the hearing officer's findings. *See Heather S. v. Wisconsin,* 125 F. 3d 1045, 1052 (7th Cir. 1997). But we must not "substitute [our] own notions of sound educational policy for those of the school authorities." *Board of Educ. Of Community Consol. Sch. Dist. 21 v. ISBE (Dist. 21),* 938 F. 3d 712, 715-16 (7th Cir. 1991). We independently evaluate the testimony and evidence, but defer to the hearing officer's determinations. *See Heather S.,* 125 F. 3d at 1053. Essentially, this means we should not reverse the hearing officer's findings simply because we disagree with them. However, we review purely legal questions *de novo. See Morton Community Unit School Dist. No. 709 v. J.M.,* 152 F. 3d 583, 588 (7th Cir. 1998). Therefore, this Court's decision is based on the preponderance of the evidence. *Id. Patricia P.,* 203 F. 3d 462, 466-67 (7th Cir. 2000).

**C. The IEP's Goals and Objectives Were Defective in Some Respects But Not in All But The Hearing Officer Erred When She Concluded that John Only Needed Consultative OT Services.**

The Parents claim that the Hearing Officer erred by finding that the IEP included adequate statements of John's current levels of performance, measurable annual goals and objectives, and evaluation criteria that would allow John's parents to track John's progress from his current performance to the annual goal's contemplated performance. This error, Parents claim, effectively excused District 65 from its absolute obligation to meet IDEA procedures for

drafting goals and objectives, the heart of any IEP.

"The IEP is the basic mechanism through which th[e] goal [of providing a FAPE] is achieved for each disabled child." 20 U.S.C. § 1401(a)(20). The IEP is a written statement containing the following:

> (i) a statement of the present levels of educational performance, including--

>> (I) how the child's disability affects the child's involvement and progress in the general curriculum; or

>> (II) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities;

> (ii) a statement of measurable annual goals, including benchmarks or short-term objectives, related to–

>> (I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and

>> (II) meeting each of the child's educational needs that result from the child's disability;

> (iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child-

>> (I) to advance appropriately toward attaining annual goals;

>> (II) to be involved and progress in the general curriculum in accordance with clause (i) and to participate in extracurricular and other nonacademic activities; and;

>> (III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph;

> (iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular calls and in the activities described in clause (iii);

> (v)(I) a statement of any individual modifications in the administration of State or district

wide assessments of student achievement that are needed in order for the child to
participate in such assessment; and

> (II) if the IEP Team determines that the child will not participate in a particular State or
> district-wide assessment of student achievement (or part of such an assessment), a
> statement of –

> (aa) why that assessment is not appropriate for the child; and

> (bb) how the child will be assessed;

> (vi) the projected date for the beginning of the services and modifications described in
> clause (iii), and the anticipated frequency, location, and duration of those services and
> modifications;

> ...

20 U.S.C. §1414(d)(1)(A); 34 C.F.R. Part 300, Appendix A.

We find, for the most part, that the IEP satisfies the criteria set forth in the statute and the

regulations interpreting such. Page one of the IEP discusses in general the present levels of

John's performance in the subjects of reading, math and writing. Pages two-eleven then discusses

the sublevels at which John was functioning for those subjects, the evaluation procedures used,

the criteria for mastery, the date on which John's progress was reviewed and the extent to which

these objectives were met. Some of the goals especially in the areas of reading, math and English

are very specific in that they list the specific tasks which John is to hopefully achieve. These

specific tasks establish the objective criteria needed to measure John's progress. As the Hearing

Officer noted "[ t]he reading goals... and [ t]he speech/language goals are well integrated and

together they set out an appropriate program that addresses the Student's deficit...." Thus, from a

planning perspective the IEP is very clear as to the skills and sub-skills John was expected to

develop, when he was expected to reach these goals and in some instances the program under

which he would be learning these skills. The progress John would make could clearly be evaluated. Therefore, with respect to these core subjects we find that sufficient benchmarks are present and the record supports the conclusion that John's 2000-2001 IEP was reasonably calculated to confer education benefits on him.

We also agree with the Hearing Officer that although the 2000-2001 IEP was not completed by the end of the school year this does not constitute a procedural violation of the Act. The MAPS process should have been separated from the IEP development meeting since it took up over 3 of the 4-4½ hours of the May 12, 2000 IEP meeting. However, a second meeting was held on June 7, 2000 after John's Parents had signed the triennial reevaluation. The Hearing Officer then recommended that the best practice would be to provide all the year end progress reports, evaluations, etc. to the Parents the week before the IEP developmental meeting and schedule a 4 hour IEP meeting early in May, or in the alternative, if the School District wants to provide the reports in person, to plan for two IEP meetings of at least two hours each. We agree that under these circumstances that the School District did not violate the Act.

On the other hand, the objectives with respect to the Occupational and Physical therapy goals as well as the social/emotional goals are not sufficiently detailed and both fail to describe and analyze the effect of John's disability on these two areas of his education. The preponderance of the evidence reveals that the Hearing Officer erred when she concluded that the IEP appropriately provided only 30 minutes per month of consultative services in the area of occupational therapy.

The evidence is undisputed that John needs direct occupational therapy services despite the due weight given to the Hearing Officer's decision. *See Heather S. v. Wisconsin,* 125 F. 3d

1045, 1052 (7th Cir. 1997). Ms. Duba found inconsistencies with John's fine motor skills. The testimony of Alma Woods, a therapist with 40 years of experience, an independent evaluator and Ms. Duba indicated that John has fine motor skill problems, visual-motor skills problems and is dependent on others for help. The concerns raised by the independent evaluation done by Pathways as well as the information set forth in the letter from the Chicago Rehabilitation Institute indicate both fine and gross motor skills problems which are far below John's age.

John who was nearly 10 years old at the time of the evaluation was evaluated at a 4-year, 8 month age level in activities involving cutting with scissors, drawing a line within paths, and copying certain shapes. Direct skills training is what is needed to improve these skills not consultative. We disagree with the School District's characterization of Mr. Jones testimony that he agreed such therapy could take place on a consultative basis with respect to all of John's occupational therapy needs. (Tr. II-217-218). If John cannot use a spork or hold a compass independently–how will he socially and academically progress in school? Even his grasp of a pencil still appears to be unstable. Obviously, John needs more occupational therapy to become independent in fine-motor tasks. Clearly, Duba failed to consider these motor planning deficits.

Hence, we cannot agree with the School District that this deficiency, at most, is only a technical violation because the absence of this information left a void in the School District's mind as well as the IEP as to the what John's needs really were. The extent of John's oculomotor deficits were never clearly delineated. Thus, we agree with the Parents that the Hearing Officer erred by not affording any weight to the testimony of the independent therapists and as a result of such reached an erroneous decision.

As to John's physical therapy needs it is undisputed that Ms. Anderson, the School

District's physical therapist evaluated John and this evaluation was based on classroom observation, consultations with John's classroom teacher, John's aide and John's private therapists. John was observed in music, art, PE, drama, lunch and recess. The Physical Assessment Inventory utilized by Ms. Anderson claims to evaluate classroom mobility, school building mobility, lunchroom mobility, playground mobility and bathroom mobility. A checklist for the P.E. curriculum was also utilized in John's assessment.

However, it is also undisputed that John's parents were concerned regarding John's physical abilities not only because of physical conditions common to children with Down Syndrome, i.e. pronation of feet, but also because there is some evidence that John was falling and injuring himself. It is undisputed that John suffers from joint laxity which is seen in children with Down Syndrome as well dynamic balance issues. Furthermore, there is a distinct discrepancy between what the District claims John is capable of doing physically at school and the independent therapist's report which found John at 4-5 year level compared to his ten years of age.

In January of 2000 John's private physical therapist reported that John began complaining of bilateral knee pain and that it was difficult to assess the cause of this pain because of John's inability to do so. The therapist noted that this may be leading to increased joint stress at the knees. This private therapist then explained in detail the various areas in which John needed further therapy noting that in many of the exercises John needed "cuing" to complete the exercise correctly. The private therapist administered the standardized "Test For Gross Motor Development" which ranked him in the less than 1% range for locomotor skills and the 37% range for object control skills. This therapist noted that John demonstrates most difficulty with

bilateral control locomotor skills (skipping, sliding, hopping, running).

Finally, it is undisputed that John could only run half as far as age appropriate classmates, his grasp of pencils and other school instruments is awkward, his keyboarding clumsy–all of which in combination make John's learning process more frustrating. We conclude that the Physical Therapy Goals were too vague in John's IEP. We find this to be a technical violation at most because it is undisputed that John was still scheduled to receive 60 minutes of Physical Therapy each week. Thus, a substantive violation of the Act has not occurred.

As to the social/emotional goals we find that the Hearing Officer's characterization of the lack of these goals is a "technical violation" and it appears that the School District has committed to addressing these goals at a future IEP meeting.

## D. Support for School Personnel and Supplementary Aids

Parents allege that the IEP is also defective because it failed to consider Supports For School Personnel and Supplementary Aids. On the last page of John's June 7, 2000 IEP the School District answered the section titled Supports For School Personnel with the statement "[s]upport + consultation as needed and determined by staff." The fact that the IEP does not go into detail cannot be concluded to be a procedural violation of the Act.

The Parents relying on *Olberti v. Bd. of Ed.,* 99 F. 2d 1204, 1220-23(3rd Cir. 1993) claim that this vague type of answer is a procedural violation of the Act. The Act requires and its regulations require schools to provide supplementary aids and services to enable children with disabilities to learn whenever possible in a regular classroom. *See* 20 U.S.C. §§ 1401(a)(17), 1412(5)(B); 34 C.F.R. §300.551.(b)(2). The regulations specifically require school districts to provide "a continuum of placements..to meet the needs of handicapped children." 34 C.F.R. §

300.551(a). The continuum must "[m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placements." 34 C.F.R. § 300.551(b).

Accordingly, a school "must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction," *Greer v. Rome City School Dist.,* 950 F. 2d 688, 696 (11th Cir. 1991), speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disabilities. If the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's main streaming directive. The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Greer,* 950 F. 2d at 696.

The parents' reliance on *Olberti* is misplaced. *Olberti* addressed the decision of the Clementon School District to place Rafeal Olberti in a separate special education program outside the school district. *Id.* at 1206. The District court found that the school district had failed to give adequate consideration to including Rafael in a regular classroom with supplementary aids and services . *Id* at 1221. The only goal provided by Rafael's kindergarten teacher prior to this decision was to "facilitate Rafael's adjustment to the kindergarten classroom." *Id.* After reviewing the IEP, the Parents' expert testified that "no supplementary aids and services were provided for Rafael in the 1989-1990 kindergarten class." *Id.*

John M's situation is just the opposite. The School District has made available to John an

aide, a Special Education Resource teacher, a speech therapist, a psychologist, occupational therapist, physical therapist and other personnel which would enable John to mainstream into regular classroom. In addition, John is using a number of assistive learning aides such as keyboarding, a posture chair, a specialized computer program and EAROBICS. John's case is clearly not similar to Rafael's.

It is also undisputed that John's curriculum has been modified to enable the learning process and that the School District adopted at the Parents' request an Adaptations/Modifications/Support Grid For 2000-2001. Thus, it cannot be concluded that the IEP team failed to consider supports for School Personnel and Supplementary Aids.

Moreover, the additional support Parents seek here is the use of an Inclusion Facilitator who with would work with John's developing needs each year, changing staff each year, the different experience levels of new teachers as well as some of the basic IEP procedures. The Parents claim that this Facilitator is also needed because of the history of the IEP process. The Parents contend that the Hearing Officer erred when she failed to order such relief and ignored the overwhelming evidence supporting such. It is undisputed that the School District admitted to the Hearing Officer that a fairly contentious atmosphere prevails between the parties.

One can only walk away with the conclusion that John M.'s education has become a battleground between the Parents and the School District something that it should not be. It is undisputed that the Parents have pushed on a number of issues with respect to John's education and in some instances the School District has responded and in others it has not. In other instances the Parents do appear to be trying to micro manage the School District something that is clearly inappropriate. It is undisputed that Mrs. M.'s relationship with the principal of

Orrington is one in which she is being subjected to constant criticism on the smallest of issues i.e. attendance on a field trip turns into a situation of reprimand and the overall relationship between the parties now no longer allows them to be fully participating partners in John's education. Moreover, it is undisputed that Daniel Thompson, the Director of Special Services, for the School District has had to intervene to help the M.'s get John's IEP for the Fall, 2000 school year drafted as well as on other issues.

The Parents have also complained to the U.S. Department of Education Office of Civil Rights regarding retaliatory conduct they have allegedly been subjected to and John was suspended from the Orrington lunchroom for spitting. This suspension was shortly thereafter rescinded but the situation obviously reflects the frustration level of the Orrington Principal—one of the key people to be coordinating John's education. So where does the situation lead us?

In light of all of the above it can only be concluded that an Inclusion Facilitator would be helpful. If an Inclusion Facilitator is available through Project Choices, as Mr. Stone indicates in his opening argument, the defendant is ordered to consider the Facilitator's input. This Court will not, however, order the hiring of an Inclusion Facilitator at additional expense to the School District because we cannot concluded that the School District failed to take appropriate steps in coordinating and training the staff to ensure John's education.

### E. John's Behavior Management Plan

John's Parents also claim that the IEP failed to review John's Behavior Management Plan. It is undisputed that John had a behavior management plan developed by the School District in 1997 by Nellie Ayala-Feeney, John's Special Education Resource Teacher and Lisa Benson. A functional analysis performed by Benson preceded it. Feeney testified that the plan

was very successful and Benson testified that John's behavior was better in 3rd grade than in 2nd. The record reveals that John had some sporadic instances of misbehavior for which he was disciplined. The Multi disciplinary Conference Summary in December of 1999 reveals that the issue of John's behavior management was raised by John's mother to Dr. Thompson and that the staff felt that the plan in effect was functional and that John had not needed a time out for several weeks. Furthermore, John's relationship with his aide, Ms. Amos, helped prevent behavioral difficulties. In general the record reveals that for the most part John now conforms his behavior to the socially acceptable norms of his school. As the Hearing Officer noted the issue was never raised in the MAPS process—which discussed John in every respect. Finally, the Adoption/Modifications/Support Grid describes behavior management strategies, including the utilization of the "behavior management system/notebook. Therefore, we agree with the Hearing Officer that a Behavior Management Plan *per se* is not necessarily required to enable John to effectively learn.

**F. The Parents Are Entitled to Reimbursement of Their Costs**

The Parents' next argument puts forth that the Hearing Officer erred when she refused to order reimbursement of the Parent's costs of the independent evaluations in occupational and physical therapy. Pursuant to 34 C.F.R. §300.502(b), Parents are entitled to reimbursement by the District for John's private OT and PT evaluations by Pathways only if the District's OT and PT evaluations were not appropriate. The Hearing Officer found that the District's evaluations were appropriate. Citing *Board of Education of Murphysboro v. Illinois Board of Education,* 41 F. 3d 1162 (7th Cir. 1994), the Parents argue that the nature and extent of OT and PT services provided for John were deficient and the additional evaluations needed.

It is undisputed that John's parents indicated their disagreement with Defendants' OT and PT evaluations prior to obtaining an independent evaluation. 34 C.F.R. § 300.502(b)(1) (2000). It also appears that the School District did not comply with 34 C.F.R. 300.502(b)(2)(ii), which requires the School District to provide the parents with "agency criteria" when they request an Independent Evaluation. Mr. Thompson's June 12, 2000 letter denying the Parents' request fails to review this criteria. The PT therapists conducted evaluations which used a standard checklists designed to evaluate John's needs in general but in light of the substantial testimony revealing John's deficits in gross and fine motor skills, discussed in section E of this opinion, it is hard to understand why the School District made the decision that it did.

Because John's parents had raised these physical concerns to the District and the District disregarded these concerns we find that the District unlawfully relied upon limited criterion, its combined OT and PT evaluations, in determining John's needs. Thus, the Parents are entitled to reimbursement of the $800.00 they spent to have the independent evaluations done. The fact that some of this testing was administered in a non-standardized manner is not outcome determinative so long as the conditions are properly noted *see* 34 C.F.R. 300.532(c)(2) and the Parents have met their burden of proof.

### G. The Hearing Officer Correctly Found that Ms. Duba was Not Qualified

The Parents claim that the Hearing Officer had no foundation in the record for her determination that the use of therapist, whose license to practice was still not yet finalized by the State, was only a technical violation of the law and that 30 minutes per weeks of consultative services by an occupational therapist would be reasonably calculated to meet John's needs.

John's parents further argue that the weight of the evidence demonstrates that John needed and needs direct services by an occupational therapist rather then mere consultative services by an occupational therapist consulting with untrained staff members. We agree with the Hearing Officer. Ms. Duba's license was not yet finalized by the State and supervision on the job site was required pursuant to Title 68, part 1315 of the Illinois Administrative Code.

## H. The Parents are "Prevailing Parties" Within the Meaning of the IDEA

In this case, the Parents argue that they are a "prevailing party" entitled to attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B). Specifically, the Parents argue that they are a "prevailing party" because they received the benefit of the compensatory occupation therapy services. Under the fee shifting provisions of IDEA, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). The term "prevailing party" connotes the same general meaning under 42 U.S.C. § 1988, and cases interpreting both sections apply the same principles to determine a plaintiff's entitlement to attorneys' fees. *See e.g. Tice v. Botetourt County School Bd.,* 908 F. 2d 1200, 1205 n. 4 (4th Cir.1990). In *Farrar v. Hobby,* 506 U.S. 103, 113 S. Ct. 566, 573, 121 L. Ed. 2d 494 (1992) the Supreme Court explained that a " a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* John's parents prevailed at the hearing with respect to Ms. Duba's license and in the case at hand with respect to the Inclusion Facilitator and two procedural violations. Thus, it can only be concluded that the Parents are prevailing parties within the

meaning of the statute.

## CONCLUSION

For the reasons set forth above the Parents' motion for summary judgment is granted in part and denied in part. The Parents are entitled to the following damages: one year in compensatory occupation therapy, $800 to cover their fees for the IEE, use of an Inclusion Facilitator if he or she is at no cost to the School District and reasonable attorney fees and costs. The School District's motion for summary judgment is granted as to the alleged violations of the IEP in which we upheld the Hearing Officer's decision and the Parents' request for compensatory education as to physical therapy, speech therapy, and reading and math is denied. This case is hereby terminated. This is a final and appealable order.

So Ordered                                    Entered: _Ronald A. Guzman_

**Judge Ronald A. Guzman**
**United States Judge**